# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

## NO: 13-60002

| | |
|---|---|
| **TROUT POINT LODGE, LIMITED, A Nova Scotia Limited Company; VAUGHN PERRET and CHARLES LEARY** | **APPELLANTS** |
| **VERSUS** | |
| **DOUG K. HANDSHOE** | **APPELLEE** |

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

---

## REPLY BRIEF OF APPELLANTS, TROUT POINT LODGE, LIMITED, A NOVA SCOTIA LIMITED COMPANY, VAUGHN PERRET, AND CHARLES LEARY

Henry Laird (MSB No. 1774)
Email:  hlaird@joneswalker.com
JONES WALKER LLP
2510 14th Street, Suite 1125 (39501)
Post Office Drawer 160
Gulfport, MS  39502
Telephone: (228) 864-3094
Facsimile:(228)864-0516

{GP012379.1}

# <u>TABLE OF CONTENTS</u>

<u>PAGES</u>

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

List of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

1.    The Nova Scotia Court had jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . .1

2.    The publications at issue were false. . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

3.    Handshoe concedes the Nova Scotia Default Judgment against
      him means the allegations of falsity are proved since Handshoe
      did not rebut the point in his brief. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

4.    The defamation judgment sought to be enforced in Mississippi
      satisfies both prongs of the SPEECH Act.  28 U.S.C. § 4102(a).. . . . . . .18

5.    Trout Point, Perret, and Leary met the *New York Times*
      reckless disregard for the truth standard which public officials
      and public figures are required to meet . . . . . . . . . . . .. . . . . . . . . . . . . .21

6.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Certificate of Compliance with Rule 32(A). . . . . . . . . . . . . . . . . . . . . . . . . 24

## LIST OF AUTHORITIES

CASES                                                                              PAGES

*Calder v. Jones,*
465 U.S. 783, 789-90 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10, 11, 12

*Clemens v. McNamee,*
615 F.3d 374, 379 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 12

*Coreas v. L-3 Commc'ns–Eos*,
2012 WL 2959347, at *8, n. 4 (N.D. Tex. July 20, 2012) . . . . . . . . . . . . . . . . 13, 16

*Ehrenfeld v. Bin Mahfouz,*
881 N.E.2d 830 (N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Friou v. Phillips Petroleum Co.*
948 F.2d 972, 974 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Greene v. Lindsey,*
456 U.S. 444, 449-450 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Investorshub.com, Inc.,*
Case No. 4:11cv9-RH/WS (June 20, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Mars v. Jones,*
329 U.S. 545, 550-51 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Metropolitan Opera Ass'n, Inc. v. Local 100,*
*Hotel Employees and Restaurant Employees Int'l Union*
2004 WL 1943099 at *1 (S.D.N.Y. Aug. 27, 2004) . . . . . . . . . . . . . . . . . . . . .17

*New York Times v. Sullivan,*
376 U.S. 254 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18, 19, 21, 22

*Third Nat'l Bank v. Atlantic City,*
130 F. 751, 754 (3d Cir. 1904). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Revell v. Lidov,*
317 F.3d 467 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## STATUTES

28 U.S.C. § 4102 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

28 U.S.C. § 4102(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 4103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 4(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

Federal Rule of Civil Procedure (1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

Federal Rules of Civil Procedure 55. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Mississippi Rule of Civil Procedure 4(d)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . 2

Mississippi Rule of Civil Procedure 55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Restatement (Second) Conflict of Laws § 92, (1967) . . . . . . . . . . . . . . . . . . . . .18

1.    <u>The Nova Scotia Court had jurisdiction.</u>

The SPEECH Act enables an American defamation defendant to remove a defamation plaintiff's proceeding to enforce a judgment entered in the court of a foreign nation, as Defendant Doug K. Handshoe ("Handshoe" or "defendant") has done. *See* 28 U.S.C. § 4103.

Upon removal, the SPEECH Act burdens the defamation plaintiff with proving that the foreign court had jurisdiction over the American defamation defendant:

> The party seeking recognition or enforcement of the foreign judgment shall bear the burden by making the showing that the foreign court's exercise of personal jurisdiction comported with the due process requirements that are imposed on domestic courts by the Constitution of the United States.

28 U.S.C. § 4102(b)(2).  Plaintiffs Trout Point Lodge, Limited ("Trout Point"), Vaughn Perret ("Perret) and Charles Leary ("Leary") (collectively, "plaintiffs" or "Trout Point plaintiffs") met that burden.  On September 13, 2011, Trout Point, Perret and Leary personally served Handshoe with process, and put Handshoe on actual notice of the proceedings against him.  (R. Vol. 1, pp 86-89 and 129-31).  In fact, Handshoe admits that Trout Point, Perret and Leary served him with process and that he knew about the Canadian proceedings against him.  (Brief of Appellee p. 4; p. 9, n 1).

Personal service is the gold standard of giving notice in both the United States and Canada. *See Greene v. Lindsey*, 456 U.S. 444, 449-450 (1982).

> The fundamental requisite of due process of law is the opportunity to be heard. And the right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest. Personal service guarantees actual notice of the pendency of a legal action; it thus presents the ideal circumstance under which to commence legal proceedings against a person, and has traditionally been deemed necessary in actions styled *in personam*.

*Id*. at 449 (internal citations and quotations omitted). The personal service the Trout Point plaintiffs effected on Handshoe complies with both Federal Rule of Civil Procedure 4(e)(1) and (1)(A) and Mississippi Rule of Civil Procedure 4(d)(1)(A).

Handshoe's libelous publications concerned the Nova Scotia activities of Nova Scotia residents. The publications impugned the Trout Point plaintiffs' reputations and made allegations of moral turpitude against Perret and Leary, whose business and careers were and are centered in Nova Scotia. Many publications were drawn from Nova Scotia or Canadian sources, and Trout Point, Perret and Leary suffered the brunt of the harm, in terms both of their emotional distress and the injury to their professional reputations. Thus, Nova Scotia is the focal point both of Handshoe's publications and of the harm suffered. Jurisdiction over Handshoe was therefore proper in Nova Scotia based on the "effects" of his

Mississippi conduct in Nova Scotia. *See e.g., Calder v. Jones*, 465 U.S. 783, 789-90 (1984) (finding that because the defendants' "intentional, and allegedly tortious, actions were expressly aimed at California[,]" and the defendants "knew that the brunt of that injury would be felt by [plaintiff] in the State in which she lives and works[,]" then "[u]nder the circumstances, [defendants] must reasonably anticipate being haled [sic] into court there to answer for the truth of the statements made in their article"). Defendant's intentional conduct satisfied both the "tort prong" of Mississippi's Long Arm Statute and the due process requirements of the United States Constitution.

Handshoe's publications show that the subject matter of and the sources relied upon for the numerous publications were in Nova Scotia. *See e.g., Clemens v. McNamee*, 615 F.3d 374, 379 (5th Cir. 2010) (articulating a requirement that the forum be the "focal point of the story"). In this matter, Nova Scotia was the focal point of the barrage of stories that concerned the Plaintiffs. This proposition is supported by the two volume Hearing Book that was introduced into evidence in the Nova Scotia proceeding. Some specific examples of Handshoe's publications that had a Nova Scotia focal point are as follows:

> Ok folks I'm sitting on around 10 posts worth of tips without a lot of time to publish anything [sic] but I saw the Times Picayune ran a correction to yesterday's story that dealt with former Jefferson parish President Aaron Broussard's reported ownership of a **Nova Scotia luxury vacation lodge** that he allegedly rented to parish venders.

Charles Leary told the *Times Picayune* reporter Richard Rainey: . . . Broussard, "does not and has never had any ownership or management involvement with Trout Pont Lodge, Limited." The message went on to say Broussard owns a "vacation home on the same road."

I'm told Raphael is the kind of guy who looks before he leaps. Broussard may not own Trout Point but then again I'm not used to seeing such an international twist to owning a simple vacation house. Stay tuned.

(R. Vol. 1, p. 231) (emphasis added).

Leary, Perret and Abel were trying to use the **Canadian Libel laws** to strong-arm the *Picayune* and their parent Advance Publications.

Now perhaps Advance does not keep **up with changes in Canadian Libel laws or maybe the** fact that Leary and the girls advertised in sister company Conde Nast Johanses guide swung the corporate decision toward retracting factual news story but whatever the calculus Leary and the gang thought they buried the story.

"So who are the investors in Trout Point and what did they invest in? Why is this important? Maybe because of the government assistance Leary, Abel and Perret received in **Canada** via the **Atlantic Canada Opportunities Agency.** That assistance, **in the form of a "repayable contribution" is the current subject of litigation in Nova Scotia** and one of the major sticking points in discovery was the disclosure of the names of the owners."

(R. Vol. 1, 234-235) (emphasis added).

This was important enough for Leary to **appeal to the Supreme Court of Nova Scotia** but he did not find much relief there either.

(R. Vol. 1, p. 235) (emphasis added).

> I've just been informed . . .
>
> That the newest chapter of the **Slabbed Nation has been formed in Nova Scotia** and those good folks are wanting to see a conclusion of some kind of our earlier posts on Trout Point Lodge and its connections to the Jefferson Paris Political Corruption Scandal. How can I deny our newest fans such a request? Simple [sic] I can't.

(R. Vol. 1, p. 237) (emphasis added).

> Ring --- Ring---- Ring----- Heloow, yes this is the Mississippi State Police--- you say your name is Dudley Doright of the **Royal Canadian Mounted Police**--- and you say you want to extradite a Doug Handshoe------- son, do you realize that Mr. Handshoe and family rode out Katrina on his roof a couple of years ago while certain other cowards evacuated entire cities and later cried ---- and son one last thing, when you come with a division or more better look like bringing several thousand plastic bags to take back all your horseshit from our clean roads as we have strict laws against shit, especially all the way from **Canada**. Dudley--- Oh Dudly--- you still there son.
>
> I couldn't download that particular **Dudley Doright video** but I viewed it and know it's out there in cyberspace. Punch in **Dudley Doright** cartoons in the you tube [sic] website and look for "damsel in distress" video.
>
> If you are successful, better pull down your shades and barricade the door as this area is crawling with the internationally feared RCMP-i.e. **Royal Collection of Mounted Pussies.**

(R. Vol. 1, p. 240) (emphasis added).

> While Rainey focuses his articles on the curious **Nova Scotia** connection involving Broussard and the complaint to the Louisiana Ethics Commission, Rainey's articles contained some damning evidence of potential wrongdoing involving Leary and Perret in Canada and it had nothing to do with Broussard per se. In fact I'd submit to this day neither Rich Rainey or [nor] his employer know the real reason why Leary and Perret went postal on them after his story on Trout Point appeared in January, [sic] 2012 [sic] but that changes today. Our first stop is **the courts in Nova Scotia** and the suit against one of the girls [sic] business misadventures there, La Ferme D'Acadie by the Canadian Government through the Atlantic Canada Opportunities Agency.

(R. Vol. 1, p. 241) (emphasis added).

> The dispute was the crash and burn of the **Nova Scotia boutique farm** and rolling over some of the money into Trout Point. The **ACOA** wanted their [sic] money back because it is clear they [sic] feet [sic] the girls were less than honest in dealing with them [sic] and according to local lore [sic] so do the trade venders that originally did business with Team Trout Point.

> Then they realize they made a mistake, they failed to register as the all important "limited" corporation that protects their assets, so they fixed that right away, dissolving this and registered Trout Pont Lodge Ltd Dec 14, 1998, and this time they took off Abel's name, and just have Leary and Perret as partners, **their address being 189 Trout Point Rd, East Kemptville**. Now note that their address likely changed to Trout Point Road after 1998, **likely in 2000 when the Lodge was built**.
> None of this is new ground here at Slabbed and in reality Raney was 100% factually correct in his reporting. Now I am open to the possibility Raney's employer is pusillanimous in the way they hung him out to dry but I

also suspect Rainey and the gang had no clue as to Leary's **testimony before a Canadian court**.

Now if I paid taxes in **Nova Scotia** I think I'd want an explanation and full accounting of the ownership of Trout Point Lodge and it's relationship to the failed venture **La Ferme D'Acadie** as it appears the shifting of assets and ownership could well indicate that the **ACOA was defrauded.** to [sic] the extent Leary claimed discrimination in a **Canadian court** for being gay while freely marketing **Trout Point as a Gay Owned Lodge in Kemptville Nova Scotia** illustrates the dishonesty inherent to his dealings with the **Nova Scotia court system.**

(R. Vol. 1, pp. 242-243) (emphasis added).

"Have I been screwing with them? Of course I have," Doug tells me via phone from Louisiana.
"I was prepared for this lawsuit. I was warned that I was going to be sued, and I consider this (lawsuit) a gift," he says, adding that he's re-posted much of the suit's text to his website.

The ballsy blogger says he's been all over the state searching for evidence of nefarious activities on the part of Chuck and Vaughn, and the suit is simply the culmination of his amateur gumshoe work.
"My blog is the search for the truth," Doug bleats. "This is a constitutional issue, and in this case, the Constitution and the First Amendment are on my side."
I hear there is more in the pipeline too. If it is true there is no such thing a bad publicity then the girls will be happy to see the **latest issue of *Frank Magazine*.**[1]

(R. Vol. 1, p. 245) (emphasis added).

---

[1] *Frank Magazine* is published in Halifax, Nova Scotia.

> Obviously the girls at Trout Point lodge do not have a
> stellar business record folks from their failed Washington
> Parish Exotic Cheese Farm to the defunct **Nova Scotia
> Dairy farm** to the ill fated Cerro Coyote Hotel project,
> all of which were at least partially paid for with other
> people's money. After Aaron Broussard's fall from grace
> and the end of pay to play Nova Scotia style things just
> got plain worser [sic] for the girls at Trout Pont who tried
> everything, from marketing the lodge as gay friendly to
> rolling out all the PR stops. **Without the ferry service
> from Portland** [sic] **Maine** it simply isn't worth the very
> long trip overland to the lodge, which is stuck out in the
> middle of no where [sic]. And of course once you get
> there the hidden charges are a real bitch as **this
> disappointed guest points out at Trip Advisor,** one of
> the **travel sites where the girls advertise heavily[.]**

(R. Vol. 1, 246) (emphasis added).

> The entire blog is well worth the read folks and frankly
> the thought of Leary driving around **Nova Scotia** in a
> Range Rover telling customers to fuck off after stiffing a
> multitude of local investors is literally the stuff that
> makes for a basher's dream as it looks more and more as
> if Aaron Broussard's market making for the girls [sic]
> business ventures was in reality extortion under the color
> of law. I'll leave that for the FBI and others to sort out.

> As always stay tuned for more on Trout Point Lodge as
> the connections between the owners of Trout Point and
> the disgraced Aaron Broussard come into sharper focus
> here on Slabbed.

(R. Vol. 1, p. 247) (emphasis added).

> Uh Andrew: Don't you have anything better to than
> criticize free speech? You seem perversely interested in
> the bitchslapping being delivered to the **Canadian
> Queens**. You a little light in your loafers too? Oh and
> just in case you are an Officer of the Court attorney type

> let me lighten up with a lawyer joke: Why did the sharks no eat the lawyer who fell of his boat? Professional courtesy. Hee hee hee.

(R. Vol. 1, p. 248) (emphasis added).

> What can I say folks, he was a grifter in the exotic cheese biz down here and evidently remains the same in **Nova Scotia** as Slabbed literally trips on all the skeletons in the pasts of the girls at Trout Point Lodge. He remains a loser because he still doesn't know how to properly serve his frivolous lawsuits:

> Stay tuned as disgruntled former employees of Trout Point Lodge are contacting Slabbed with info as Slabbed systematically solves the Mystery in **Nova Scotia** and its connections to the disgraced Aaron Broussard. I'd like to once again thank the good people at West Law for the occasional fair use of their documents.

(R. Vol. 1, p. 249) (emphasis added).

> We got the full scene on tap soon Locke. I'm up late 'cause I literally just got off the phone with a new friend in **Canada**. The stories about Vaughn Perret and how he despised Aaron Broussard in spite of the fact he mooched off Aaron and Danny Abel. Vaughn is a real special kind of top bitch.

(R. Vol. 1, p. 250) (emphasis added).

> Perret and Leary and all their SLAPP suit threats bother me not one bit. My own opinion is they are cowards but I have some paper for them should they ever crawl out from under their rock **in Nova Scotia** and set foot back down here or maybe I'll follow the treaty and have them served in **Canada**. Meantime I have plenty of time to track down every lead and leave no stone unturned. The response from our new friends in **Nova Scotia** has been fantastic.

(R. Vol. 2, p. 253) (emphasis added).

> This is getting good folks. I highly recommend clicking over the **Shelburne County Today**[2] post on this topic as it appears the locals in **Nova Scotia** have become hip to the Mystery **on the Shores of the Tusket River**[3].

(R. Vol. 2, p. 255) (emphasis added).

> The more people find out the more people that talk to me, especially the long and distinguished list of people in **Nova Scotia** the girls have fucked over in the way they conduct business.
> Like I told the guy at **Frank Magazine** the girls did me a big favor. At this point I'd like to add that I am the puppetmaster and the girls are my puppets.

(R. Vol. 2, p. 258) (emphasis added).

In *Calder v. Jones*, the Court held that the defendants should have "reasonably anticipate[d] being haled [sic] into court" in the state at which they directed their intentional and allegedly tortious actions, as that state was the "focal point." *Calder*, 465 U.S. at 789. This "focal point" has two components: the subject of the defamatory publication and the harm suffered. *Id.* "An individual injured in [Nova Scotia] need not go to [Mississippi] to seek redress from persons who, though remaining in [Mississippi], knowingly cause the injury in [Nova Scotia]." *Id.* at 790. Here the Nova Scotia Court had jurisdiction over Handshoe

---

[2] A publication in Nova Scotia.

[3] This river is located in Nova Scotia.

because of his intentional conduct in Mississippi that was calculated to cause injury to the Trout Point plaintiffs in Nova Scotia. *Id.* at 791 (holding that the jurisdiction in California was proper because of defendants intentional conduct in Florida "calculated to cause injury" to the plaintiff in California). It is clear that the "focal point" of the publications in this matter, as contemplated by *Calder*, is Nova Scotia, Canada. Moreover, the harm the Trout Point plaintiffs suffered also occurred in Nova Scotia. Nonetheless, Handshoe does not address the "focal point" of plaintiffs' injuries. In fact, Handshoe abandons *Calder v. Jones* in his response to Trout Point plaintiffs' principal brief even though this Court recently found that *Calder v. Jones* is "[t]he most instructive case on this issue." *See Clemens,* 615 F.3d at 379. Handshoe does cite *Revell v. Lidov*, however, but it is distinguishable on its facts. *Revell*, 317 F.3d 467 (5th Cir. 2002). In *Revell*, the defendant wrote an article about plaintiff, but it did not reference Texas or the plaintiff's Texas activities – which were few, nor was it directed to Texas readers (as distinguished from readers in other places). *Id.* at 469. "Texas was not the focal point of the article or the harm suffered, unlike *Calder*, in which the article contained descriptions of the California activities of the plaintiff, drew upon California sources, and found its largest audience in California." *Id.* at 473. The facts here resemble *Calder* rather than *Revell*, and Handshoe had a clear focal point: Nova Scotia.

Handshoe's focal point is indisputably Nova Scotia, and any due process concerns should therefore be allayed. This Court in *Clemens* provided that *Calder* requires "the plaintiff seeking to assert specific personal jurisdiction over a defendant in a defamation case to show (1) the subject matter of and (2) the sources relied upon for the article were in the forum state." *Clemens*, 615 F.3d at 380. If this showing is made, then logically sufficient minimum contacts would exist. *See e.g., Calder*, 465 U.S. at 789-84 (finding defendants should reasonably anticipate being hauled into court to answer for their defamatory comments directed at a California resident). Here, Handshoe's malicious publications were intentionally directed to Nova Scotia, and the act of publishing them constituted sufficient minimum contacts for the court there to have jurisdiction.[4] Further, Handshoe was personally served with process in Mississippi and he received notices of intended or actual action against him beginning in May 2011. (R. Vol. 1, pp 86-89 and 129-31). Despite this proper and actual notice, Handshoe refused to appear and later failed to resist the default judgment entered against him.

---

[4] In addition to targeting the Nova Scotia activities of Plaintiffs, Defendant Handshoe made extensive use of Nova Scotia sources for his published writings. This included accessing information from Nova Scotia government entities such as the Registry of Joint Stocks database, decisions published on the Nova Scotia courts web site, and the registration-only Nova Scotia Property Records Database, whose use actually requires registration and contractual agreement. Handshoe also admits to contact with Nova Scotia sources in the person of his Nova Scotia blog readers – who interactively communicated with him – and he republishes from Nova Scotia magazines including the tabloid *Frank Magazine* and the government publication *Nova Scotia Open to the World*. He also gave in interview to *Frank Magazine* about the plaintiffs before they filed the Amended Statement of Claim. *See* Affidavit of Charles Leary, filed July 11, 2012 ¶¶ 27 and 39-53; R. Vol. 5, pp. 1054-1068.

2.    The publications at issue were false.

Beginning at page 18 of Brief of Appellee, Handshoe argues that Trout Point, Perret, and Leary did not prove the publications at issue were false, thereby failing to make their determination pursuant to Mississippi law.  Handshoe argues nothing in support of this proposition except that the district court found that Trout Point, Perret, and Leary failed to prove falsity. (Brief of Appellee, p. 20).

Trout Point, Perret, and Leary, in their principal brief, painstakingly detail no fewer than eight (8) claims of falsity that they allege in their Compliant in the Canadian proceeding. (Brief of Appellants, p. 18).   Specifically, Trout Point, Perret, and Leary denied being involved in fraud, kickback, and money laundering schemes; stated "the publications were false and defamatory"; stated that the violations before the Ethics Board were false; stated that Handshoe's publications were replete with inaccuracies; stated that the publications were false and held Trout Point, Perret, and Leary up to public contempt and ridicule; stated that the publications were made without regard to whether they were true or false; stated that the publications were "false"; and stated Handshoe lied about Trout Point, Perret, and Leary (R. Vol. 1, pp. 95, 96, 98-99, 110, 100, 111, 113, and 115).  As a result, Handshoe has admitted the allegations and findings of falsity by abandoning the any argument to the contrary.  *See e.g., Coreas v. L-3 Commc'ns–Eos*, 2012 WL 2959347, at *8, n. 4 (N.D. Tex. July 20, 2012).

Trout Point, Perret, and Leary then quote holdings from the Nova Scotia Court that found the publications at issue to be false, namely that Trout Point, Perret, and Leary were "erroneously identified as being connected with Mr. Broussard"; that "Mr. Broussard was named in error as owning Trout Point Lodge"; that the publications were defamatory; that "there are many, many more blogs which contain defamatory materials such as those which are included in the materials filed with the Court on January 30th"; that Trout Point, Perret, and Leary were erroneously identified as being connected with Mr. Broussard and Broussard was erroneously published to have owned Trout Point Lodge; that "[t]he defendant [Handshoe] knows that the original story linking Mr. Broussard with Trout Point has been retracted and an apology published"; that the publications contained "unfounded statements"; that Handshoe's publications misrepresented the facts; and that all of Mr. Handshoe's outrageous conduct was "in the face of true facts about the plaintiffs [Trout Point, Perret, and Leary]." (Brief of Appellants at p. 20) (R. Vol. 1, pp. 130-32, 137, 131, 172, 174-75, and 176).

Despite the Trout Point plaintiffs' and the Nova Scotia court's clear showing, Handshoe never sheds any light on his unsubstantiated allegation that Trout Point, Perret, and Leary failed to prove falsity. In sum, Handshoe wholly fails to rebut the proof set forth in the Trout Point plaintiffs' principal brief that

Trout Point, Perret, and Leary alleged falsity and the Nova Scotia Court found that falsity existed.

Both the district court opinion entering summary judgment in favor of Handshoe and Handshoe's brief on appeal concede that Trout Point, Perret, and Leary proved all elements of a Mississippi defamation claim except falsity. The district even found that Handshoe "began an internet campaign to damage Perret and Leary" by publishing "numerous entries on Slabbed" about Plaintiffs, "many of which may be characterized as derogatory, mean spirited, sexist, and homophobic." (R.E. 3-4). As Trout Point, Perret, and Leary argued in their principal brief, they proved all elements of a Mississippi defamation claim in the Nova Scotia proceeding by not only proving the publications at issue were false, but also that they were uttered in total disregard for the truth, which met the *New York Times* malice standard even though Canadian law did not require it. *See, New York Times v. Sullivan,* 376 U.S. 254 (1964) . The Nova Scotia court's finding that the publications at issue are false is equally clear, unambiguous and likewise unrebutted. This Court should now find the element of falsity was proven and found to exist by the Nova Scotia Court and remand the case to the district court for entry of summary judgment in favor of Trout Point, Perret and Leary.

3. <u>That Handshoe concedes the Nova Scotia Default Judgment against him means the allegations of falsity are proved since Handshoe did not rebut the point in his brief.</u>

Beginning at page 14 of Brief of Appellants, Trout Point, Perret, and Leary argue that pursuant to the Federal Rules of Civil Procedure and Mississippi Rules of Civil Procedure 55, all the allegations in the Nova Scotia proceeding were deemed to be admitted by Handshoe since he failed to appear and contest those claims. In his principal brief, Handshoe completely ignores this argument, which means that on this appeal he confessed that the Nova Scotia default judgment already determined the publications at issue were false. *See e.g., Coreas*, 2012 WL 2959347, at *8, n. 4 (N.D. Tex. July 20, 2012) ("The Fifth Circuit has held that a party is considered to have abandoned a claim if he inadequately briefs an issue.") (citing *Friou v. Phillips Petroleum Co.*, 948 F.2d 972, 974 (5th Cir. 1991)). Therefore, Handshoe has admitted both the allegations of falsity and the Nova Scotia Court's finding of falsity.

While the SPEECH Act does not mention default judgments, it arose out of a foreign default judgment case. *See Ehrenfeld v. Bin Mahfouz*, 518 F.3d 102 (2d Cir. 2008). Other cases have acknowledged the role that a default judgment can play in SPEECH Act cases, too. For example, in *Metropolitan Opera Ass'n., Inc. v. Local 100, Hotel Employees and Restaurant Employees Int'l Union,* a case involving public figures and a matter of public interest, the defendants argued that plaintiff had to prove falsity as a threshold issue in order to prevail, even in default on a motion for reconsideration of a defamation default judgment. *Metropolitan*

*Opera Ass'n*, 2004 WL 1943099, at *1 (S.D.N.Y. Aug. 27, 2004). The facts and law in *Metropolitan Opera* parallel the instant case, and that court found as this Court should: "the logic of the cases dictates that no special First Amendment exception be created. It has long been the law that there is no due process bar to default or dismissal." *Id.* at *13.   The Metropolitan Opera court went on:

> the [defendant] asserts that the [plaintiff] has failed to prove the falsity or defamatory content of defendants' speech, and/or that the Court had some obligation to assess individually the false and defamatory nature of these statements and defendants' malice in making each statement. All of these arguments are, in fact, backdoor attempts to attack the merits of the [Plaintiff's] claim. But, in the words of the Court of Appeals, 'there was a time for that and [, defendants] cannot elect to default and then defend on the merits. [They] cannot have [their] cake and eat it too."

*Id.* at *18 (internal citations and quotations omitted).

    In the absence of fraud or collusion, a default judgment is as conclusive an adjudication between the parties as a judgment rendered after answer and complete contest in the open courtroom. *Mars v. Jones,* 329 U.S. 545, 550-51 (1947) ("A judgment of a court having jurisdiction of the parties and of the subject matter operates as res judicata, in the absence of fraud or collusion, even if obtained upon a default"); and *Third Nat'l Bank v. Atlantic City,* 130 F. 751, 754 (3d Cir. 1904) ("A judgment by default is just as conclusive an adjudication between the parties of whatever is essential to support the judgment as when rendered after answer and

contest."). The polestar is whether a reasonable method of notification was employed and reasonable opportunity to be heard is afforded to the defendant against whom a default judgment is taken. *See* RESTATEMENT (SECOND) CONFLICT OF LAWS § 92, (1967). Handshoe cannot rest upon his generalizations that the allegations of falsity and the Nova Scotia Court's findings of falsity were invalid. In the Brief of Appellants, Trout Point, Perret, and Leary argue numerous specific allegations and findings of falsity that Handshoe was required to rebut. Yet Handshoe did not even make an attempt to do so. The consequence of that failure is that he has confessed Trout Point, Perret, and Leary's allegation that they proved defamation's element of falsity.

4.     The defamation judgment sought to be enforced in Mississippi satisfies both prongs of the SPEECH Act. 28 U.S.C. § 4102(a)

Handshoe argues that despite the Nova Scotia Court's finding that Trout Point, Perret, and Leary satisfied the *New York Times* reckless disregard for the truth standard, the Canadian law that was applied "in that case" did not afford Handshoe the same First Amendment protection that he would have received in an American court. Handshoe also argues that the Nova Scotia judgment would not have been entered against him in a Mississippi court since Mississippi defamation law requires proof of falsity. As was argued in the principal brief and again in this brief, Trout Point, Perret, and Leary not only alleged falsity, but the Nova Scotia court found the publications at issue were false.

If this Court accepts Handshoe's illogical arguments – that a Canadian court, though not required, nonetheless found reckless disregard for the truth and that even though Canadian law did not require proof of falsity, such proof was clearly made – then there can never be a Canadian defamation judgment executed in the United States against an American citizen.  This is certainly not the intention of the SPEECH Act.  The Acts' purposes are to prevent libel tourism and to assure that American citizens being sued in foreign courts for defamation receive the same First Amendment protection that they would in the United States.   It bears repetition that Handshoe was afforded the same protection that he would have if the Trout Point plaintiffs sued him in the Southern District of Mississippi (1) since the Nova Scotia court, while not required, found the publications were made in reckless disregard for the truth (the First Amendment standard adopted by *New York Times*) and (2) since the Nova Scotia court found clear proof of falsity of those publications, which Handshoe admitted by virtue of the default judgment.

At page 6 of his brief, Handshoe argues that the Nova Scotia court "completely failed to make a threshold determination that the laws of Canada would afford Handshoe as much free speech protection as he would enjoy in the United States."  Mr. Handshoe cites no authority in favor of this absurd proposition as there is no such authority.  Nowhere in the SPEECH Act can such a requirement be found.  Handshoe next contends that there was no showing in the Nova Scotia

or Mississippi federal district court that Trout Point, Perret, and Leary "could have prevailed in establishing that they were the subject of defamation and entitled to damages under the laws of the State of Mississippi." (Appellee's Brief, p. 6). The entire principal brief of Trout Point, Perret, and Leary is dedicated in opposition to this argument, and no further argument should be made now.

At page 16 of his brief, Mr. Handshoe argues that *Investorshub.com, Inc. v. Mina Mar Group* is somehow authority for the proposition that Canadian law, as applied in the Nova Scotia proceeding, was not as protective "in that case" as it would have been if Handshoe had litigated in the Mississippi court. *See* Stipulated Final Judgment in *Investorshub.com, Inc.*, Case No. 4:11cv9-RH/WS (June 20, 2011). The *Investorhub.com* Court gives no explanation for its conclusion: that Canadian law is not as protective as American First Amendment considerations because possibly "in that case" they were not as protective. *See generally id.* In the absence of an explanation, the reader is left wondering how to apply *Investorhub.com*. Furthermore, the *Investorhub.com* case was not contested; it was merely an agreed settlement resulting in dismissal, as opposed to the instant case that proceeded to default judgment that found Trout Point, Perret, and Leary were defamed due to Handshoe's failure to appear after being personally served with the summons and complaint. *See generally, id.*

5.     Trout Point, Perret, and Leary met the *New York Times* reckless disregard for the truth standard which public officials and public figures are required to meet.

At page 21 of his brief, Mr. Handshoe argues without explanation or support that Trout Point, Perret and Leary are public figures and are therefore required under the First Amendment to meet the reckless disregard for the truth standards recognized by *New York Times* and its progeny.  While Trout Point, Perret, and Leary are not public figures, and while there is absolutely no proof that they are public figures, they nonetheless met the reckless disregard for the truth standard imposed upon public figures in bringing defamation actions in the United States. Thus, as was argued in the principal brief, it is irrelevant whether Trout Point, Perret, and Leary are public figures since they met the reckless disregard for the truth standard required of public figures. As a result, Handshoe's argument concerning punitive damages, as articulated on page 26 of his brief, must also fail.[5]

6.     Conclusion.

The Trout Point, Perret and Leary have shown that (1) the Nova Scotia court had jurisdiction; (2) Handshoe's publications have been proved to be false; (3) that Handshoe conceded Trout Point plaintiffs' argument regarding falsity; (4) the defamation judgment satisfies both prongs of the SPEECH Act; and (5) the Trout

---

[5] Trout Point plaintiffs provide further detail on the issue of punitive damages in their principal brief, beginning on page 22.

Point plaintiffs met the *New York Times* reckless disregard for the truth standard. In light of the foregoing and the arguments in Trout Point, Perret and Leary's principal brief, this Court should remand the case to the district court for entry of summary judgment in favor of the Trout Point plaintiffs.

Respectfully submitted, this the 11th day of April, 2013.

Trout Point Lodge, Limited, Vaughn Perret and Charles Leary

By:    S/  Henry Laird
Henry Laird,
Mississippi Bar No. 1774

Email:  hlaird@joneswalker.com
Jones Walker LLP
2510 14th Street, Suite 1125 (39501)
Post Office Drawer 160
Gulfport, MS  39502
Telephone: (228) 864-3094
Facsimile: (228) 864-0516

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing Brief of Appellants has been filed in the office of the Clerk for the United States Court of Appeals for the Fifth Circuit via the court's CM/ECF filing system which sent notification of same to the following:

<u>Counsel for Appellee</u>

G. Gerald Cruthird, Esquire
Post Office Box 1050
Picayune, Mississippi  39466
Email:  ggeraldc@bellsouth.net

Jack E. Truitt, Esquire
The Truitt Law Firm, LLC
149 North New Hampshire Street
Covington, LA  70433
Email:  mail@truittlaw.com

This the 11th day of April, 2013.

s/ Henry Laird
Henry Laird

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to 5th Cir. R. 32.2.7(c), the undersigned certifies this brief complies with the type-volume limitations of 5th Cir. R. 32.2.7(b).

1.     Exclusive of the exempted portions in 5th Cir. R. 32.2.7(b)(3), the brief contains

A.     This brief contains 5,497 words, including parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

2.     The brief has been prepared in proportionally spaced typeface using:

        Software Name and Version:     Microsoft Word 2003

        in (typeface name and font size):     Times New Roman Font 14.

3.     If the court so requests, the undersigned will provide an electronic version of the brief and/or a copy of the word or line printout.

4.     The undersigned understands a material misrepresentation in completing this certificate, or circumvention of the type-volume limits 5th Cir. R. 32.2.7, may result in the court's striking the brief and imposing sanctions against the person signing the brief.

        s/  Henry Laird
        Henry Laird